IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ERVIN COLLINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 06 C 2405 |
| | ) | |
| v. | ) | Mag. Judge Michael T. Mason |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Plaintiff, Ervin Collins ("claimant" or "Collins"), has brought a motion for summary judgment seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Collins' claim for Disability Insurance Benefits (Title II) pursuant to the Social Security Act ("Act"), 42 U.S.C. §§ 416(I) and 423, as well as Collins' claim for Supplemental Security Income (Title XVI) under the Act, 42 U.S.C. § 1382(a)(3)(C). The Commissioner filed a cross-motion for summary judgment asking that we uphold the decision of the Administrative Law Judge ("ALJ"). This Court has jurisdiction to hear the matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, claimant's motion for summary judgment is granted in part and denied in part, and the Commissioner's motion for summary judgment is granted in part and denied in part. This case is remanded to the ALJ for further proceedings consistent with this opinion.

1

**BACKGROUND**

**Procedural History**

On March 18, 2002, claimant filed an application for Supplemental Security Income ("SSI") alleging that his disability began on May 15, 1987. (R. 36-37). That application was denied both initially and on reconsideration. (R. 26-29, 32-35). Claimant did not pursue an appeal with respect to his first application. (R. 13). Rather, claimant filed this application for Period of Disability and Disability Insurance Benefits ("DIB") as well as an application for SSI on December 23, 2002. (R. 123-125, 231-232). This time, claimant alleged that his disability began on September 11, 2001. (*Id.*). These applications were denied initially on February 10, 2003, and after reconsideration on March 28, 2003. (R. 99-102, 105-108). Subsequently, claimant requested a hearing, which ALJ Edward B. Pappert held on April 13, 2005. (R. 109-115). At the hearing, both claimant and Vocational Expert ("VE") Christopher Yap ("Yap") testified. (R. 244-272). On November 21, 2005, ALJ Pappert issued his written decision denying both of claimant's applications for benefits. (R. 13-21). The Appeals Council denied claimant's request for review on March 23, 2006, effectively rendering ALJ Pappert's decision the final decision of the Commissioner. (R. 6-8); *Estak v. Apfel*,152 F. 3d 636, 637 (7th Cir. 1998). On July 21, 2006, claimant filed this action in the district court.

**Claimant's Testimony**

Collins is a forty-seven year old male with a tenth grade education who has attempted to obtain his GED without success. (R. 253).[1] He is single and lives with his

---

[1] At his hearing, Collins testified his date of birth as February 30, 1960. (R. 249). However, multiple medical records indicate that Collins' actual date of birth is May 3, 1960. (R.

mother at her residence.  (R. 249).  Claimant does not have a driver's license.  (R. 253).

Collins testified that he stopped drinking alcohol "over two years" ago, but that he would

drink a beer occasionally.  (R. 259-260).  He also said that he does not drink anymore

since the doctor told him that he has a liver condition.  (R. 259).

Claimant alleged disability since May 15, 1997.  (R. 104).[2]  Collins testified that

he first experienced seizures following a blow to the head with a lug wrench that

occurred in 1987 or 1988.  (R. 255).  He further testified that he has seizures once a

week, sometimes twice a week.  (*Id.*).

Collins testified that for eighteen years, he worked as a relief man at a chocolate

factory.  (R. 250-251).  During the course of his employment, claimant never informed

his employer of his head injury or his seizures.  (R. 262).  Instead, Collins testified that

only his cousin knew about the seizures.  His cousin instructed claimant to lie down in

the den when his symptoms resurfaced and to allow a co-worker to substitute for him.

(R. 262-263).  Collins allegedly suffered seizures at work and was bothered by the heat

and the cold.  (R. 263).  Although his testimony is confusing, Collins claims that the

seizures and sensitivity render him incapable of performing the same tasks.  (R. 262).

Ultimately, claimant was fired from his job at the chocolate factory.  (R. 251).  Collins

attributed his dismissal to an accident that resulted in a shattered window.  (R. 252).

Following his dismissal from the chocolate factory, claimant worked through a

temporary services agency until September 2001.  (R. 250).

_____

201, 203, 220).

[2] Initially, Collins alleged a disability onset date of September 11, 2001.  (R. 231).
However, Collins amended his onset date to May 15, 1997.  (R. 104).

3

Claimant's last date of employment was September 11, 2001. (*Id.*). Since then, Collins stated that he lies around the house, takes medication, and reads frequently. (R. 254). Collins testified that he experiences one or two seizures each week, during the day and at night, with physical effects such as a loss of bladder control, shaking and weakness following the seizures. (R. 255, 263-264). Claimant also testified that sometimes he injures himself during a seizure, suffering cuts to his lips and head. (R. 263). Collins testified that he would go to the emergency room and receive "booster shots" when he neglected to take his medication. (R. 255). Collins explained that he failed to take his medication (Dilantin, an anticonvulsant prescription medicine) because he experienced adverse side-effects, including slurred speech, an elevated heart rate, and light sensitivity. (*Id.*).

Additionally, Collins testified that he injured his knee two years ago and was told by his physicians to use a cane because of various knee and leg problems. (R. 256-257). Claimant further testified that he contracted hepatitis C, for which he takes vitamins and pain pills. (R. 260-261). Collins said that the hepatitis C makes his body jump and ache, and that he suffers sharp sensations through his body that shock his brain. (R. 261).

**Vocational Expert's Testimony**

VE Christopher Yap testified at the administrative hearing. (R. 266-269). After reviewing claimant's file, the VE testified that claimant's job as a relief man at the candy company was considered an "unskilled occupation performed at the medium level of exertion." (R. 266). VE Yap testified that claimant's temporary service job as a general laborer was considered skilled, with the exertional level ranging from light to heavy . (R.

266-267).  The VE testified that his opinion was based upon and consistent with the Dictionary of Occupational Titles ("DOT") and Selected Characteristics of Occupations. (R. 267).

The ALJ then asked VE Yap a series of questions regarding a hypothetical individual's ability to perform jobs in the economy, subject to the following functional limitations: the individual had the same age, education, work experience as Collins, as well as the inability to work around dangerous moving machinery, unprotective heights, or in any other situation in which having a seizure would be dangerous to the individual or others.  (268).  The VE concluded, "from an ethical point of view," the hypothetical individual could not return to any past relevant work.  (*Id.*).

The VE proceeded to testify that a person with the hypothetical individual's limitations could perform other jobs in the economy.  (*Id.*).  Specifically, VE Yap testified that a person with the hypothetical individual's limitations could work in packaging or sorting.  (*Id.*).  According to VE Yap, in Illinois, there are 44,743 packaging jobs and 24,457 sorting jobs, respectively.  (R. 269).  The ALJ then asked the VE about a hypothetical individual with the above limitations as well as restrictions that the person could not walk or stand for more than 2 hours total in an 8-hour day, or for more than 15 to 20 minutes at a time.  (*Id.*).  VE Yap testified that such an individual could not perform the packaging jobs, and that the number of sorting jobs would be reduced from 24,457 to 9,783.  (*Id.*).  VE Yap concluded, however, that a person with these additional limitations could perform work as a cashier, of which 32,279 positions exist in Illinois. (*Id.*).

**Medical Evidence**

Claimant alleged that his disability stems from a head injury he suffered in 1987 or 1988. (R. 255). Medical records from St. Bernard Hospital dated August 3, 1988 indicate that claimant was hospitalized for a compound, comminuted, depressed right frontal temporal skull fracture. (R. 220, 223). Claimant subsequently underwent a surgical procedure on the right frontal craniotomy with elevation of the depressed fracture, closure of dural laceration and debridement. (R. 221, 223). Contemporaneous medical records indicate that claimant claimed to smoke marijuana at intervals but did not use intravenous drugs. (R. 221).

Medical records obtained from Cook County Hospital between the years of 1996 and 2003 disclose outpatient treatment for exudative pharyngitis, urethritis, headaches, and viral syndrome. (R. 199-212). During this time, claimant was repeatedly instructed to abstain from alcohol, was prescribed Dilantin, Ranitidine, Folic Acid, Zantac, Thiamine, and Motrin. (*Id.*). On November 27, 1999, claimant went to the emergency room at Cook County Hospital complaining of sore throat, weakness and headaches. (R. 207). He reported having a seizure one week ago but denied taking any medications. (*Id.*). He was prescribed Motrin and told to take Tylenol. (*Id.*).

On April 22, 2002, Dr. Fauzia A. Rana ("Dr. Rana") conducted an internal medicine evaluation of claimant. (R. 69-71). Claimant's chief complaints were headaches and dizziness. (R. 69). He also complained of aching pains in his hands, lower back, and ankles. (*Id.*). Dr. Rana noted that claimant demonstrated no difficulty in breathing or in movement during the examination. (R. 70). Dr. Rana concluded that claimant's pulse, head, eyes, ears, nose, throat, neck, lungs, cardiovascular system, muscoskeletal system, and peripheral pulses were normal. (*Id.*). Claimant's extremities

6

were void of edema, ulcers, or varicosities. (*Id.*). His skin was determined to be of normal turgor, abdomen was soft and nontender, and no limitation of movement of the cervical, dorsal, or lumbosacral spine was observed. (*Id.*). The neurological examination revealed a satisfactory gait, grossly normal motor power, normoactive reflexes, and an intact sensory system. (*Id.*). Dr. Rana found claimant to be alert, oriented to time, place, and person, and cooperative with a normal affect. (R. 71). He further noted that claimant had a fair ability to concentrate, was seemingly capable of handling his funds, and was able to do simple mathematics. (*Id.*). Dr. Rana's records reveal that claimant denied experiencing any seizures. (R. 69). Under the social history heading, Dr. Rana wrote that claimant smokes "half a pack of cigarettes per day", drinks occasionally, and smoked marijuana one year ago. (*Id.*). Dr. Rana's clinical impression was that claimant had a history of headaches and athralgia (joint pain). (R. 71).

In 2002, several State Disability Determination Services ("DDS") physicians evaluated claimant's condition. (R. 74-87, 88-95). On May 27, 2002, DDS physician, Dr. D.G. Hudspeth ("Dr. Hudspeth"), completed a Psychiatric Review Technique Form. (R. 74-87). He found no medically determinable impairment. (R. 74). Dr. Hudspeth specifically stated that claimant had "no mental impairment." (R. 86). On May 31, 2002, Dr. George Kudnka, another DDS physician, completed a Physical Residual Functional Capacity ("RFC") assessment of claimant. (R. 88-95). He diagnosed claimant with headaches and athralgia. Dr. Kudnka found no limitations and declared that the physical examination was "essentially unremarkable." (R. 88-95). On August 28, 2002, Dr. William Conroy, another DDS physician, reviewed the file and concurred with Dr. Kudnka's RFC assessment. (R. 88).

7

On January 8, 2003, Dr. Roger Kao ("Dr. Kao") conducted an internal medicine evaluation and completed a State of Illinois Medical Evaluation Physician's Report. (R. 178-184). Dr. Kao's records indicate that claimant complained of seizures since 1987 and occasional dizziness. (R. 183). He informed Dr. Kao that he was not compliant with his medication and that he stopped taking Dilantin in 1989. (*Id.*). Claimant reported that he had not seen a doctor since then. (*Id.*). Claimant continued to drink alcohol until two months prior to the evaluation. (*Id.*). He reported having three seizures per month. (*Id.*). He claimed that his last seizure was in the last month before the evaluation. (*Id.*). Claimant described his seizures as "tonic clonic in nature," lasting about one minute. (*Id.*). He complained of urinary and fecal incontinence and post ictal confusion. (*Id.*).

Dr. Kao performed a limited mental status evaluation and found that claimant was appropriate, polite, pleasant and cooperative. (*Id.*). He stated that claimant was able to relate coherent medical history without cognitive difficulties. (*Id.*). Dr. Kao also stated that claimant's affect was normal, without signs of depressive disorder, agitation, irritability or anxiety. (*Id.*).

In the Physician's Report, Dr. Kao indicated that claimant's cardiovascular, respiratory, muscoskeletal, digestive, genitourinary, neurological, endocrine, immune, and lymphatic systems were normal. (R. 179-180). Claimant's visual acuity was 20/40 bilaterally. (R. 179). In assessing claimant's functional capacity, Dr. Kao found that claimant retained full capacity to perform physical activities of daily living. (R. 181). In particular, he found that claimant had "full capacity" to sit, stand, walk, bend, stoop, turn, climb, push and pull. (*Id.*). However, Dr. Kao limited claimant's weight lifting to a

maximum of 50 pounds occasionally with frequent lifting of up to 25 pounds. (*Id.*). With respect to claimant's mental impairments, Dr. Kao found no functional limitations for purposes of claimant's activities of daily living. (*Id.*). He found that claimant suffered from mild functional limitations with respect to social functioning and concentration, persistence, and pace. (*Id.*).

On January 22, 2003, claimant received emergency room treatment at Cook County Hospital for a right eyelid stye as well as a refill of his seizure medication. (R. 201-202).

On January 29, 2003, another DDS physician, Dr. Victoria J. Dow ("Dr. Dow") completed an updated physical RFC assessment. Once again, she found that no exertional, postural, visual, manipulative, or communicative limitations were established. (R. 185-192). However, Dr. Dow did limit claimant to occasional climbing of ramps and stairs, and indicated that he should never climb ladders, ropes or scaffolds.[3] (R. 187). Dr. Dow further recommended that claimant avoid concentrated exposure to hazards such as machinery and heights. (R. 189). In the comment section of the RFC, Dr. Dow stated that claimant had seizure disorder which developed after a head injury. (R. 192). She reported that claimant's last seizure was one month ago. (*Id.*). Dr. Dow stated that claimant "has not been complaint with this medications." (*Id.*). She further remarked that claimant had stopped taking Dilantin in 1989 and had not had medical follow-up since then. (*Id.*). Finally, Dr. Dow stated that claimant has a history of alcohol usage

---

[3] On the RFC assessment form the term *occasionally* is defined as "occurring from very little up to one-third of an eight hour workday (cumulative, not continuous)." (R. 195)(emphasis added).

and that he stopped approximately two months ago.  (*Id.*).  On March 20, 2003, Dr. Conroy reviewed the file and concurred with Dr. Dow's RFC assessment.  (R. 185).

On February 18, 2003, claimant went to the emergency room for a medication refill.  (R. 199).  He reported that his last seizure was on January 6, 2003.  (*Id.*). Claimant was prescribed Dilantin, Zantac, Folic Acid and Thiamin.  (R. 200).  On March 20, 2003, claimant was again seen at Cook County Hospital's emergency room for a seizure medication refill.  (R. 193-194).  He was advised to take his medication as prescribed.  (R. 194).  The diagnoses were chronic seizure disorder and elevated liver enzymes.  (*Id.*).

On April 1, 2003, claimant went to Cook County Hospital's emergency room complaining of "chronic gut pain."  (R. 196).  His liver enzymes were elevated and claimant tested positive for Hepatitis C.  (R. 197).  The treating physician advised claimant to get a primary care physician because his liver enzyme condition was potentially fatal.  (*Id.*).  Based on the record, it does not appear that claimant ever saw a primary care physician.

On July 25, 2003, claimant received emergency care at Cook County Hospital for a refill of seizure medication and to inquire about worsening right knee pain.  (R. 215). Claimant was diagnosed with right knee effusion and contusion and was instructed to follow up at the Fantus Health Center.  (R. 217).  He was instructed to take medication as directed.  (*Id.*).

Outpatient progress notes from the Fantus Health Center from January to April 2004 indicate that claimant received hepatitis A and B vaccinations, routine evaluations, and prescription refills.  (R. 224-225).  One of the progress notes suggests claimant

undergo a psych consult for depression.  (R. 225).  Another note indicates that claimant smoked crack.  (R. 225).

On January 26, 2004, claimant was seen again at Cook County's emergency room.  (R. 226-229).  Claimant was diagnosed with seizure disorder and hepatitis C. (R. 228-229).  Claimant reported that his last seizure was one week ago.  (R. 226).  He received medication refills and was instructed to take medication daily as prescribed and to follow up with his primary care physician.  (R. 229).

**Family Reports**

Claimant's family and friends completed Seizure Description Forms, in which they describe the type of seizures claimant experiences and the frequency of those seizures.  Claimant's mother, brother and a friend all indicated that claimant suffers from seizures more than once a month and that he has seizures during the day and at night. (R. 157-159).  These reports also indicate that claimant experiences jerking and thrashing movements, he loses consciousness and bladder/bowel control, and he bites his tongue during the seizures.  (*Id.*).  Each individual reported that he or she had witnessed claimant have a seizure in the days or weeks prior to completing the Seizure Description Form.  (*Id.*).

**LEGAL ANALYSIS**

    **I.    Standard of Review**

We must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  *Steele v. Barnhart,* 290 F. 3d 936, 940 (7th Cir. 2002).  Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55

F. 3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.

Ct. 1420, 28 L.Ed.2d 842 (1971)).  We must consider the entire administrative record,

but will not "reweigh evidence, resolve conflicts, decide questions of credibility, or

substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.

3d 535, 539 (7th Cir. 2003) (quoting *Clifford v. Apfel*, 227 F. 3d 863, 869 (7th Cir. 2000)).

We will "conduct a critical review of the evidence" and will not let the Commissioner's

decision stand "if it lacks evidentiary support or an adequate discussion of the issues."

*Id.*  While the ALJ "must build an accurate and logical bridge from the evidence to his

conclusion," he need not discuss every piece of evidence in the record.  *Dixon v.*

*Massanari*, 270 F. 3d 1171, 1176 (7th Cir. 2001).  The ALJ must "sufficiently articulate

[his] assessment of the evidence to assure us that the ALJ considered the important

evidence . . . [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v.*

*Shalala*, 999 F. 2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler*,

766 F. 2d 284, 287 (7th Cir. 1985)).

## II.     Analysis Under the Social Security Act

To be entitled to either disability insurance benefits or supplemental security

income payments, the claimant must establish that he is "disabled" under the Social

Security Act.  A person is disabled under the Act if "he or she has an inability to engage

in any substantial gainful activity by reason of a medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §

423(d)(1)(A).

In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: (1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling (a listing level impairment), (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy. *Dixon*, 270 F. 3d at 1176. The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F. 3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ followed this five-step inquiry in his decision. The ALJ reserved a finding as to step one because, in his opinion, there existed an independent basis for denying claimant's application. (R. 14, 20). At step two, the ALJ concluded that claimant's impairments, including his history of seizure disorder, chronic headaches with dizziness, hepatitis C, right knee contusion/effusion, compound comminuted depressed right frontal temporal skull fracture, and polysubstance abuse, met the definition of "severe" for purposes of the inquiry. (*Id.*). At step three, the ALJ determined claimant's impairments did not meet the requirements of any listing level impairment. (R. 15, 20).

Before proceeding to step four, ALJ Pappert established claimant's RFC. The ALJ found that claimant's impairments precluded the following work related activities: lifting more than 100 pounds occasionally or more than 50 pounds frequently; performing work with or near dangerous moving machinery; and, performing work

around unprotected heights or in any other situation where having a seizure would be dangerous to the claimant or others. (R. 16). Based on those RFC limitations, the ALJ concluded that claimant could perform a limited range of heavy work. (R. 19-20). At step four, given claimant's RFC, the ALJ adopted the opinion of VE Yap and concluded that claimant is unable to perform any past relevant work. (*Id.*).

At step five, the ALJ found there are a significant number of jobs in the region that claimant is capable of performing. (R. 19, 21). Specifically, the ALJ adopted the testimony of VE Yap, who concluded that a hypothetical individual with claimant's RFC could perform the following jobs in Illinois: packaging (44,473); and sorting (24,457). (R. 20-21). Based on the foregoing, the ALJ concluded that claimant was not under a disability for purposes of Title II or Title XVI of the Act. (*Id.*).

Claimant argues that the ALJ erred: (1) by failing to determine the frequency of claimant's seizures, as required by 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 11.02; (2) by failing to explain his RFC assessment in accordance with SSR 96-8p; (3) by failing to analyze claimant's headaches, hepatitis C, and athralgia, and failing to provide functional limitations caused by these impairments; (4) by failing to provide a proper credibility analysis in accordance with SSR 96-7p; (5) by failing to adequately develop the record; and (6) by failing to question whether the VE's testimony was consistent with the DOT. We consider each of these arguments in turn.

### A. The ALJ Erred At Step Three.

At step three, an ALJ must determine whether claimant was conclusively disabled based on one of the agency's listed impairments. 20 C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P., App. 1. Under a theory of presumptive disability, a claimant is

eligible for benefits if they have an impairment or combination of impairments that meets or medically equals an impairment found in the listing. *Id.* ALJ Pappert concluded that the claimant's condition did not meet or equal the level of severity contemplated for any impairment listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1. (R. 15).

Claimant raises issue with the ALJ's epilepsy analysis under Listing 11.02. As constituted, § 11.02 provides:

> Epilepsy--convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment. With:
>
> A. Daytime episodes (loss of consciousness and convulsive seizures); or
>
> B. Nocturnal episodes manifesting in residuals which interfere significantly with activity during the day.

20 C.F.R. Pt. 404, Subpt. P., App. 1, § 11.02.

Claimant contends that the ALJ erred because he failed to determine the frequency of claimant's seizures and because he failed to explain the consideration given to medical evidence and reports obtained from family members concerning claimant's seizure pattern. In his decision, the ALJ stated that:

> [t]he criteria under section 11.02 are not satisfied because the claimant's seizure disorder does not occur more frequently than once a month in spite of at least three months of prescribed treatment with daytime episodes (loss of consciousness and convulsive seizures) or nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

(R. 15). However, the ALJ failed to articulate how he arrived at this conclusion. At step three, the ALJ failed to discuss any of the objective medical evidence or explain how

15

that evidence demonstrated that claimant did not suffer from seizures more than once a month. Even if claimant's testimony was disregarded as not credible, the record does contain medical evidence showing that claimant suffered from chronic seizures. (R. 178, 193-194, 197, 201-202, 204, 214, 225, 229). The record also contains reports from claimant's family members indicating that he suffered from seizures during the day and at night and that he had more than one seizure per month. (R. 157-159). The ALJ never discussed these records.

Furthermore, the ALJ failed to discuss evidence demonstrating that claimant was not compliant with his medication. Because the record contains evidence of noncompliance, the ALJ should have discussed the effect claimant's noncompliance had on his seizure pattern. (R. 183, 192). The Seventh Circuit has specifically stated that "evidence of noncompliance by itself proves nothing." *Steele*, 290 F. 3d at 941-43.[4] What matters is "whether the record contains evidence of a causal link between the noncompliance and the ongoing seizures." *Id.* The ALJ never analyzed whether the record contains such a causal link. Instead, the ALJ simply concluded in a cursory fashion that claimant did not meet Listing 11.02. (R. 15). Because the ALJ failed to articulate how he arrived at this conclusion, remand is appropriate. *See Carlson*, 999 F. 2d at 181.[5]

> **B.      The ALJ's RFC Assessment Is Not Supported By Substantial**

---

[4] The *Steele* court was discussing Listing 11.03, which covers petit mal seizures. However, we find that the analysis is equally applicable under Listing 11.02.

[5] On remand, the ALJ may need to obtain information on claimant's blood drug levels if claimant establishes that frequent seizures continue to occur despite anticonvulsant therapy. See SSR 87-6.

**Evidence.**

Claimant argues that the ALJ failed to adequately explain how he arrived at his RFC assessment.  In particular, claimant argues that the ALJ failed to include, or explain the reasons for their exclusion, certain functional limitations recorded by Dr. Kao and by State Agency physician, Dr. Dow.  Specifically, Dr. Kao's report limited claimant's weight lifting ability to 50 pounds occasionally and 25 pounds frequently.  (R. 181).   In her RFC assessment, Dr. Dow limited claimant to occasionally climbing ramps and stairs, and indicated that he should never climb ladders, ropes or scaffolds.  (R. 186).

ALJ Pappert's RFC assessment contradicts the limitations reported by Dr. Kao. Despite Dr. Kao's report, the ALJ found that claimant could lift up to 100 pounds occasionally and 50 pounds frequently.  (R. 16).  Furthermore, the ALJ's RFC assessment does not include the limitations set forth in Dr. Dow's RFC assessment. The ALJ stipulated that he gave "some weight" to these reports.  (*Id.*).  However, the ALJ failed to explain why his assessment was contrary to the limitations reported by Dr. Kao or why he omitted the limitations reported by Dr. Dow.  As a result, we cannot trace the path of the ALJ's reasoning.  Because the ALJ failed to articulate his assessment of the evidence to assure us that he considered the important evidence and to enable us to trace the path of his reasoning, remand is warranted.  *See Carlson*, 999 F. 2d at 181.

**C.     The ALJ Properly Analyzed Claimant's Headaches, Hepatitis C and Athralgia.**

Claimant also contends that the ALJ erred by failing to provide an analysis of his headaches, hepatitis C, and athralgia.  The ALJ found that the medical evidence

17

established that claimant had a history of headaches, hepatitis C, and athralgia. (R. 14). According to claimant, ALJ Pappert erred because he failed to articulate any functional limitations caused by these impairments. However, the ALJ discussed the medical evidence at length and found that the physical examinations and clinical and laboratory findings failed to provide support for claimant's allegations of disabling symptoms and limitations. (R. 16-17). Indeed, the ALJ noted that there was nothing in the record to show what, if any, treatment claimant sought or received for his conditions during the eight-year period between September 1988 through November 1996. (R. 16).

Simply put, the ALJ did not articulate functional limitations caused by claimant's headaches, hepatitis C, and athralgia because he found that the objective medical evidence did not support any such limitations. (R. 16-18). Furthermore, as discussed more fully below, the ALJ found that claimant's allegations of disabling symptoms and limitations lacked credibility. (R. 18-19). With respect to claimant's headaches, hepatitis C, and athralgia, the ALJ built an accurate and logical bridge from the evidence to his conclusion and therefore, remand on this issue is not warranted.

**D.    The ALJ's Credibility Determination Complies With SSR 96-7p.**

Claimant argues that the ALJ's credibility determination failed to comply with the requirements of SSR 96-7p. To succeed on this ground, claimant must overcome the highly deferential standard that we accord credibility determinations. Because the ALJ is best positioned to evaluate the credibility of a witness, we will reverse the ALJ's credibility finding only if it is "patently wrong." *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000). However, an ALJ must comply with the requirements of Social Security

18

Ruling 96-7p in evaluating the credibility of statements supporting a Social Security application. *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). Under SSR 96-7p, the ALJ must articulate the reasons behind his credibility finding:

> The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible". . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 97-7p.

Here, the ALJ set forth a detailed account of the factors he considered in compliance with SSR 96-7p. Following an extensive summation of claimant's allegations of disabling symptoms and limitations, ALJ Pappert listed the reasons for his determination that claimant was not fully credible. (R. 18-19). The ALJ found that claimant's allegations lacked credibility because: (1) claimant rambled and failed to provide clear answers at his hearing, (2) the record did not substantiate that his seizures worsened in recent years, (3) claimant admitted that he forgets to take his prescribed medicine, (4) the treatment he received was essentially routine and/or conservative in nature, (5) there was little medical evidence to support the alleged frequency of claimant's seizures or whether he maintained therapeutic levels of his anti-seizure medication, (6) the record reflected work activity for several years after the alleged onset date, and (7) claimant's work activity indicated that his daily activities, at least at times, were somewhat greater that he reported. (*Id.*). Based on all of these factors, the ALJ found that claimant's complaints were out of proportion to the medical

evidence. (R. 19). Accordingly, the ALJ found that claimant's allegations regarding symptoms and functional limitations were not fully credible. (*Id.*).

The ALJ's observations find support in the record. Claimant's testimony at the hearing was confusing, rambling and at times, non-responsive. (R. 249-265). The record contains little, if any, objective medical evidence to support claimant's allegations regarding his disabling symptoms and functional limitations. Furthermore, claimant admitted that he forgets to take his anti-seizure medication and the medical records reveal that claimant was consistently instructed to take his medication as prescribed but he failed to do so. (R. 183, 192, 194, 217, 229, 256). SSR 96-7p states that an individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the record indicates that the individual is not following the treatment as prescribed. SSR 96-7p. Additionally, claimant admitted that he worked for several years after the alleged onset date. (R. 250-253).

Based on the foregoing, we cannot conclude that the ALJ's credibility finding was "patently wrong." The ALJ gave specific reasons for his credibility determination in accordance with SSR 96-7p. Therefore, remand is not warranted.

### E. The ALJ Adequately Developed The Record.

It is well settled that the ALJ has an obligation to develop a full and fair record. *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000). If the ALJ has insufficient evidence or cannot reach a conclusion after weighing conflicting evidence, he must try to obtain additional evidence by requesting additional existing records, recontacting medical sources, asking the claimant for more information, or asking the claimant to undergo a consultative examination. *Luna v. Shalala*, 22 F.3d 687, 693 (7th Cir. 1994). Claimant

argues that the ALJ erred because, at the time of the hearing, the ALJ was aware of certain additional medical records from the Fantus Health Center and Cook County Hospital that documented claimant's knee impairment, hepatitis C, and seizure disorder. According to claimant, the additional medical records show that his knee problem is severe and they provide further support for his allegations of pain and functional limitations.

The Commissioner points out, and this Court agrees, that claimant was in the best position to obtain the missing records or inform the ALJ as to the existence of, and reason for, any delays. At the April 13, 2005 hearing, ALJ Pappert and claimant's former attorney orally agreed to keep the record open until May 4, 2005 in order for claimant to submit the additional medical records. (R. 270). Despite the fact that the ALJ did not issue his opinion until more than six months later, on November 21, 2005, the ALJ never received the additional records. Claimant has not articulated any reason for failing to provide the medical records to the ALJ during this lengthy interim.

Furthermore, while the ALJ must develop a full and fair record, it is the claimant's burden to prove that he is disabled. See 42 U.S.C. § 423(d)(5) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."); 20 C.F.R. § 416.912(a); 20 C.F.R. § 404.1512(a). In particular, the claimant is responsible for producing medical evidence demonstrating the severity of his or her impairments. 20 C.F.R. § 416.912(c); 20 C.F.R. § 404.1512(c).

Here, there is no evidence to suggest that claimant sought an extension of time to keep the record open past May 4, 2005 or that claimant attempted to supplement the

existing record with additional medical evidence from the Fantus Health Center or Cook County Hospital at any time prior to the ALJ's decision. Moreover, the ALJ was under no obligation to develop the record further because sufficient evidence existed to enable him to render a decision. Based on the foregoing, we decline to remand on this issue.[6]

### F.    The ALJ Failed To Comply With SSR 00-4p.

SSR 00-4 p requires an ALJ who takes testimony from a vocational expert about the requirements of a particular job to determine whether that testimony is consistent with the DOT. *Prochaska v. Barnhart*, 454 F. 3d 731, 735 (7th Cir. 2006). Specifically, SSR 00-4p requires that the adjudicator ask the VE if the evidence he or she has provided conflicts with the information provided in the DOT; and if the VE's evidence appears to conflict with the DOT, the ALJ will obtain a reasonable explanation for the apparent conflict. SSR 00-4p.

At the hearing, the ALJ asked VE Yap whether his opinion was consistent with the DOT and Selected Characteristics of Occupations. (R. 267). However, according to claimant, the ALJ's question referred to whether the VE's testimony concerning claimant's past relevant work was consistent with the DOT. Claimant argues that the

---

[6] This Court notes that there are several other avenues claimant could have pursued in attempting to have this Court consider the additional medical evidence. He could have argued that the Appeals Council's refusal to review the ALJ's decision was based on a mistake of law. *Eads v. Secretary of the Dept. of Health and Human Services*, 983 F.2d 815, 817 (7th Cir. 1993). Additionally, he could have requested remand pursuant to 42 U.S.C. § 405(g), which authorizes the court to remand a case to the Social Security Administration for consideration of newly discovered evidence. Alternatively, claimant could have petitioned the Social Security Administration to reopen his case in light of newly discovered evidence. 20 C.F.R. §§ 404.987-404.989, 416.1487-416.1489; *Eads*, 983 F.2d at 817.

ALJ never asked the VE whether his testimony concerning claimant's ability to perform work in the national economy was consistent with the DOT. The Court agrees. After the VE testified that a hypothetical individual with claimant's RFC could perform packaging and sorting work, the ALJ should have asked the VE whether his testimony conflicted with information provided in the DOT. *See* SSR 00-4p; *Prochaska*, 454 F. 3d at 735-736. The ALJ failed to do so. Accordingly, remand is appropriate.

**CONCLUSION**

For the reasons set forth above, claimant's motion for summary judgment is granted in part and denied in part and the Commissioner's motion for summary judgment is granted in part and denied in part. This case is remanded to the Social Security Administration for further proceedings consistent with this opinion. It is so ordered.

**ENTER:**

**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: February 4, 2008**